UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOHN R. ATCHLEY, a married man,

        Plaintiff,

    v.

PEPPERIDGE FARM, INC., a
Connecticut corporation,

        Defendant.

No. CV-04-452-FVS

ORDER RE: SUMMARY JUDGMENT
MOTIONS

MICHAEL GILROY, a married man,

        Plaintiff,

    v.

PEPPERIDGE FARM, INC., a
Connecticut corporation,

        Defendant.

No. CV-04-453-FVS

ORDER RE:  SUMMARY JUDGMENT
MOTIONS

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment Dismissal (Ct. Rec. 133 in CV-04-452-FVS; Ct. Rec. 128 in CV-04-453-FVS) and Plaintiffs' Motion for Summary Judgment (Ct. Rec. 118 in CV-04-452-FVS; Ct. Rec. 113 in CV-04-453-FVS).  The Court heard oral argument on these motions on March 10, 2006.  Plaintiffs were represented by Daniel Tiffany.  Defendant was represented by Rich Kuhling.

**I.    BACKGROUND**

    Defendant Pepperidge Farms, Inc. ("PFI") is a producer of baked goods, which it sells in retail food stores throughout the United

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 1

States.  PFI consigns its products to independent distributors who market and deliver it to retail outlets.  In March 2003, the *Spokesman Review* ran an advertisement for the sale of the "North Spokane to Colville" PFI distributorship for the sale price of $229,500.00.  The parties dispute who advertised this sale; PFI or the owner of the distributorship, Mr. Spangler.  Nonetheless, it is undisputed that Mr. Gilroy answered the advertisement by calling the number listed and speaking to Mr. Spangler.  However, thereafter Mr. Gilroy was referred to PFI representatives to discuss the sale of Mr. Spangler's distributorship.  Mr. Gilroy purchased the North Spokane to Colville PFI Distributorship for $299,000.00.  He paid 10 percent down and financed the remainder.  He paid the purchase price in the form of a $269,550 check from Bank of America, a $4,450 check from Sterling Savings Association and an additional $25,500 personal check.  Bank of America disbursed a check in the amount of $269,550.00 made payable to "David Spangler and Pepperidge Farm, Inc."  The check was made payable jointly to Mr. Spangler and PFI in order to pay off Mr. Spangler's bank loan to Bank of America, which PFI guaranteed, and to ensure that Mr. Spangler paid the outstanding balance he owed PFI.

PFI also advertised the sale of a second distributorship in an area described as "Spokane Valley and Northern Idaho" for $365,508.00.  The previous owner, Mr. Godwin, abandoned his route, forcing PFI to offer it for sale on behalf of Mr. Goodwin.  Mr. Atchley met with PFI employee Rick Allessio to discuss the purchase of this distributorship.  Mr. Atchley paid a $25,000 down payment to

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 2

PFI and financed the remainder of the purchase amount of $200,000 through Bank of America.  The down payment was applied to Mr. Goodwin's account and he ultimately received net proceeds from the sale of his distributorship after paying his bank loan debt of $173,638.67, which was guaranteed by PFI.

At the time of their purchases, both Plaintiffs entered into a Consignment Agreement with PFI, granting Plaintiffs the "exclusive right to distribute [PFI] Consigned Products to retail stores" within their respective territories.  The Consignment Agreement also granted Plaintiffs the right to use PFI's trade name, trademark and distinguishing colors on Plaintiffs' vehicles and equipment pursuant to the conditions set forth in the Consignment Agreement.

**II.  PROCEDURAL HISTORY**

In November 2004, Plaintiffs each filed separate actions in Spokane County Superior Court against Defendant for recision of contract and damages for breach of contract, misrepresentation, and violation of Washington's Franchise Investment Protection Act.  PFI removed both actions to this Court and the cases were set on the same briefing schedule, but have not been consolidated.

Plaintiffs previously moved for partial summary judgment and rescission of their contracts with PFI on the basis that PFI violated of the Washington Franchise Investment Protection Act ("FIPA"), RCW 19.100 et seq.  On May 20, 2005, the Court denied Plaintiffs' motions on the basis that they had not shown they paid a "franchise fee" when they purchased their distributorships.  Plaintiffs now renew their motion for partial summary judgment, arguing the new evidence shows

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 3

Plaintiffs paid numerous indirect or hidden franchise fees.  PFI cross claims for summary judgment on Plaintiffs' FIPA claim and seeks summary judgment dismissal of Plaintiffs' remaining causes of action for violation of the Washington Business Opportunity Fraud Act ("BOFA"), misrepresentation, and breach of contract.

**III. DISCUSSION**

    **A.    *Summary Judgment Standard***

    A moving party is entitled to summary judgment when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 316, 323, 106 S.Ct. 2548, 2552 (1986).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).  Inferences drawn from facts are to be viewed in the light most favorable to the non-moving party, but that party must do more than show that there is some "metaphysical doubt" as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 572, 586-87, 106 S.Ct. 1348, 1356 (1986).  There is no issue for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986).  A mere "scintilla of evidence" in support of the non-moving party's position is insufficient to defeat a motion for summary judgment.  *Id.* at 252, 106 S.Ct. at 2512.  The non-moving party cannot rely on conclusory allegations alone to create an issue of material fact.

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 4

*Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).  Rather, the non-moving party must present admissible evidence showing there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); *Brinson v. Linda Rose Joint Venture*, 53 f.3d 1044, 1049 (9th Cir. 1995).  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  "If the evidence is merely colorable...or is not significantly probative,...summary judgment may be granted."  *Id.* at 249-50, 106 S.Ct. at 2511 (citations omitted).

### B.    *Franchise Investment Protection Act (FIPA)*

To state a claim under the FIPA, the arrangement between the parties must meet the statutory definition of a franchise.  To establish that their agreements with PFI constituted a franchise, Plaintiffs must demonstrate (1) PFI granted Plaintiffs the right to distribute goods under a marketing plan substantially provided by PFI; (2) operation of Plaintiffs' business was substantially associated with PFI's trademark; and (3) Plaintiffs paid PFI a franchise fee.  *See* RCW 19.100.010(4).  "Franchise fee" is defined as

> any fee or charge that a franchisee or subfranchisor is
> **required to pay or agrees to pay for the right to enter
> into a business or to continue a business** under a franchise
> agreement, including, but not limited to, the payment
> either in lump sum or by installments of an initial capital
> investment fee, any fee or charges based upon a percentage
> of gross or net sales whether or not referred to as royalty
> fees, any payment for the mandatory purchase of goods or
> services or any payment for goods or services available
> only from the franchisor, or any training fees or training
> school fees or charges; however, the following shall not be
> considered payment of a franchise fee (a) the purchase or
> agreement to purchase goods at a bonafide wholesale price
> (b) the purchase or agreement to purchase goods by
> consignment; if, and only if the proceeds remitted by the

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 5

franchisee from any such sale shall reflect only the bona fide wholesale price of such goods; (c) a bona fide loan to the franchisee from the franchisor; (d) the purchase or agreement to purchase goods at a bona fide retail price subject to a bona fide commission or compensation plan that in substance reflects only a bona fide wholesale transaction; (e) the purchase or lease or agreement to purchase or lease supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement at their fair market or rental value; (f) the purchase or lease or agreement to purchase or lease real property necessary to enter into the business or to continue the business under the franchise agreement at the fair market or rental value; (g) amounts paid for trading stamps redeemable in cash only; (h) amounts paid for trading stamps to be used as incentives only and not to be used in, with, or for the sale of any goods.

RCW 19.100.010(12) (emphasis added). The statute suggests that a franchise fee includes "fees hidden in the franchisor's charges for goods or services." *Corp. v. ARCO*, 45 Wash. App. 563, 568, 726 P.2d 66 (1986) (holding that payments for the rental of property not at fair market value will constitute a franchise fee). Washington courts have recognized that a franchise fee may be indirect, including fees for goods or services. For example, a Washington court found that a franchise existed where a principle admitted that initial charges to the agent included cost recovery for training and marketing costs. *Lobdell v. Sugar 'N Spice, Inc.*, 33 Wash. App. 881, 892, 658 P.2d 1267 (1983) (holding that charges for the cost of finding retail locations, and company advertising and training may constitute a hidden franchise fee). Similarly, a franchise was found where the franchisor charged the franchisee rent for use of the premises based on a percentage of gross revenues rather than any estimation of fair market value of the premises. *Corp v. Atlantic-Richfield Co.*, 45 Wash. App. 563, 569, 726 P.2d 66 (1986); *see also*

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 6

*Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1220 (9th Cir. 1983) (mandatory purchases of motor oil and other products constituted franchise fee). However, a franchise fee was not found where the purported franchise agreement allowed for a fixed rate to be paid to the agent, while a markup was retained by the principle. *See e.g., Corporate Resources, Inc.* v. *Eagle Hardware & Garden, Inc.*, 115 Wash. App. 343, 350, 62 P.3d 544 (2003) (holding that profit margins on installation contracts are not characterized as an indirect franchise fee under FIPA).

In Plaintiffs' original motion for summary judgment they argued the purchase prices they paid for their distributorships constituted a franchise fee because they paid for the "right to enter into business" with PFI. In response, PFI argued Plaintiffs both purchased a distributorship, not the right to enter into a distributorship, and that Plaintiffs each purchased a PFI distributorship that was owned by the predecessor distributor, not by PFI. The Court denied Plaintiffs' motions, holding that the purchase prices did not constitute franchise fees because Plaintiffs did not show they made any unrecoverable investment with PFI or that their predecessors, Mr. Spangler and Mr. Goodwin, had paid any unrecoverable investment to PFI.

Plaintiffs now renew their motion for summary judgment on the basis that they have discovered other "hidden" or "indirect" franchise fees they were required to pay to PFI "for the right to enter into a business or to continue a business" with PFI. *See* RCW 19.100.010(12). Plaintiffs list five categories of fees they contend

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 7

constitute franchise fees:  (1) required purchase of PFI stale products; (2) mandatory participation in the pallet delivery program; (3) hand held maintenance program fees; (4) extra consideration paid by John Atchley; and (5) service charges.  Additionally, Plaintiffs argue the sum of all of these fees and/or charges constitute a franchise fee.

      1.   <u>Required Purchase of PFI Stale Products</u>

Pursuant to their Consignment Agreements, Plaintiffs, like other distributors, were required to remove from their assigned stores all "damaged and overcode (over-age) items."  In the industry, products whose shelf life had expired were referred to as stale products. Pursuant to the Consignment Agreement, Plaintiffs were permitted to sell stale products only to stores dealing exclusively in stale products (Grocery Outlets).  The stale products were not returnable to PFI for credit unless specific written permission was granted. PFI's policy of allowing distributors to sell their stale products to Grocery Outlets was designed to provide equitable relief to the distributors from the potential burden of stale products.  On August 4, 2003, PFI instituted a new "1% Stale Policy" under which distributors were no longer allowed to deliver stale products to Grocery Outlets in any fiscal period, in excess of one percent of the distributor's total sales in that fiscal period.  This one percent credit limit for returns on stale products generally tracked the actual region-wide experience for the year prior to the implementation of the Stale Policy.  Plaintiffs argue the Stale Policy created a "fee" for stale products because distributors were

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 8

charged for any stale product delivered to a Grocery Outlet in excess of the one percent limit.  More specifically, Plaintiffs argue the consignment of PFI products became a sale upon the implementation of the Stale Policy because under that new policy Plaintiffs were obligated to buy and pay for the delivered goods that were not sold before their expiration date.

A franchise fee includes "any fee or charges based upon a percentage of gross or net sales .... [or] any payment for the mandatory purchase of goods or services available only from the franchisor...."  RCW 19.100.010.  Plaintiffs argue the Stale Policy could qualify under either of these specific examples of franchise fees.  No evidence supports the contention that under the Stale Policy Plaintiffs were required to pay a fee based upon their total gross or net sales.  Further, the Court concludes that the Stale Policy does not fit within the second definition of a franchise fee because such policy does not require a "mandatory purchase of goods or services."  Although Plaintiffs argue they were "required to make a payment for the mandatory purchase of goods" by eating their lost profit from sale product, Plaintiffs were never required to purchase a set quantity of PFI product.  Thus, there was never any "mandatory purchase."  The Court recognizes that the Stale Policy shifted some of the burden of stale products from PFI to its distributors, but the policy simply created a method of risk-sharing.  Under the Stale Policy, Plaintiffs were responsible for assessing how much product they could stock on the shelves without exceeding their limit of stale product.  Although this likely required Plaintiffs to make some

changes in their inventory management techniques, it did not create a franchise fee.  Rather, Plaintiffs' losses attributable to stale product were merely a business expense inherent in the industry.

2.   Pallet Delivery Program

Plaintiffs also contend the fees they paid for their required participation in PFI's Pallet Delivery Program constitute hidden, indirect franchise fees.  PFI maintains that the Pallet Program is a benefit for its distributors, not a franchise fee.

During the purchase of their respective distributorships, Plaintiffs each signed an agreement including the following language:

> I understand that from time to time Pepperidge Farm may be requested to deliver Consigned Products to customers in palletized form through their warehouses and/or cross-docking facilities.  I hereby request that Pepperidge Farm effect such cross-dock warehouse delivery to these customers for my account pursuant to the Pallet Delivery program in effect at Pepperidge Farm from time to time.  I agree to participate in that Pallet Delivery Program and to comply with its terms.  I understand and agree that, under such Pallet Delivery program Pepperidge Farm (i) may, at its option, deliver Consigned Products to a customer's warehouse and/or cross-docking facility for delivery to retail stores in my territory and (ii) shall pay me an amount equal to the commissions for the Consigned Products so delivered to retail stores in my territory computed at the rate specified in Schedule B of my Consignment Agreement, less an amount to cover a portion of the costs incurred in connection with such Pallet Delivery Program and the delivery of products thereunder.  Until further notice, the amount of that deduction shall not exceed $30 per pallet.

The Pallet Delivery Program exists in part because Paragraph 9 of the Consignment Agreement permits PFI to deliver directly to stores who demand that PFI products be delivered shrink-wrapped on pallets and only to their central warehouses, i.e. Costco and Sams

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 10

Club.  Plaintiffs receive a 20 percent commission on the products delivered through the Pallet Delivery Program, less a $30 fee, which appears to cover the cost of shrink-wrapping the product and delivering it on pallets using forklifts and trucks with hydraulic lifts.  Plaintiffs submitted no evidence showing the $30 service fee was commercially unreasonable or that it exceeded the actual cost of shrink-wrapping and delivery.  Therefore, the Court determines the mandatory participation in the Pallet Delivery Program and payment of the $30 does not constitute a franchise fee because Plaintiffs receive something of equal value in exchange for this payment.

### 3.  Maintenance Program Fees

When Plaintiffs purchased their respective distributorships, each signed a form agreeing to participate in PFI's maintenance program for the hand-held computer system equipment owned by each distributor.  In doing so, Plaintiffs agreed that payment for their participation in the program would be automatically deducted from their accounts on a biweekly basis.  Plaintiffs contend these fees fall within the definition of franchise fee.  *See e.g., Lobdell,* 33 Wash. App. at 892, 658 P.2d 1267 (holding that mandatory charges for the cost of finding retail locations, company advertising and training constituted a hidden franchise fee).  In response, PFI submitted evidence showing the computer maintenance fee is optional, not mandatory.  Although paragraph 5 of the Consignment Agreement requires each distributor to have the necessary equipment to do the work and to maintain a computer in good and proper working condition, PFI distributors are free to buy their own computers from any source

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 11

they chose as long as the device is compatible with PFI's system. For those distributors who elect to buy their own computers, PFI provides free computer software.  Those distributors who choose to enter into a computer maintenance program receive free computer batteries, flashcards, memory cards, cables, computer paper and loaner equipment with free shipping in the event of computer malfunction.

The Court determines that the biweekly fee charged for participating in the maintenance program does not constitute a franchise fee because participation in the program is not mandatory. Although Plaintiffs contend they were led to believe the maintenance agreement was mandatory, this alone does not determine whether the maintenance program fee is a franchise fee.

        4.   Help Line Charges

Records attached to Mr. Atchley's declaration reflect that he was assessed numerous $10.00 fees by PFI.  Plaintiffs contend these fees were assessed for calling PFI's help line and that these fees constitute hidden franchise fees because they were fees Plaintiffs were "required to pay ... for the right ... to continue a business...."  RCW 19.100.010(12).  In response, PFI contends the charges were likely assessed when PFI was required to make a manual invoice adjustment to an order that was submitted in error.  PFI assesses charges when a distributor fails to properly report a transaction through his or her handheld computer.  According to PFI, all distributors have the ability to avoid these processing charges by properly reporting transactions through their handheld computers

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 12

and by submitting acceptable proof-of-delivery. Thus, PFI contends the fee, when it occurs, is a transactional cost, not a franchise fee.

Plaintiffs submitted no evidence disputing these assertions and the records themselves do not create a material issue of fact with respect to why the fees were assessed. Further, Plaintiffs have submitted no evidence showing the fee charged for PFI's services was unreasonable or not the market price for such services. Moreover, Plaintiffs submitted no evidence showing Mr. Atchley was "required to pay" the $10 fee in order to continue doing business with PFI. Therefore, the Court concludes Plaintiffs' have failed to show the fees assessed to Mr. Atchley for service charges constitute a hidden franchise fee.

     5.   Extra Consideration

In the course of negotiations, Mr. Atchley made two offers. Offer #1 was for $250,000 "and the 2/Trucks, Printer, Ordering Equipment, etc. that is needed for the operation of the distributorship." Offer #2 was for "$225,000 for the distributorship" and Mr. Atchley agreed to "purchase equipment needed for the operation of the distributorship." PFI accepted Mr. Atchley's second offer. After an accounting, Mr. Goodwin received $1,400.24. Thus, Plaintiffs contend PFI received the benefit of the additional consideration agreed to by Atchley (i.e. his agreement to purchase the necessary equipment on is own). Such consideration, Plaintiffs argue, is worth the difference between Mr. Atchley's two offers, or at least $25,000. Plaintiffs contend this "substantial

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 13

benefit received only by PFI constitutes indirectly a franchise fee."

The evidence submitted to the Court indicates Mr. Atchley purchased equipment directly from Mr. Goodwin, after Mr. Atchley purchased his distributorship.  Thus, it appears that what Mr. Atchley terms "extra consideration" was paid directly to Mr. Goodwin. Therefore, the Court concludes Plaintiffs have failed to show PFI received any additional benefit or consideration that constitutes a franchise fee.

Because Plaintiffs have failed to demonstrate they paid PFI a franchise fee, Plaintiffs have failed to meet the three-prong FIPA test.  Therefore, the Court does not engage in further analysis of the other prongs of the FIPA test because the relationship between Plaintiffs and PFI is not a franchise.  Accordingly, with respect to Plaintiffs' FIPA claim, PFI's motion for summary judgment is granted and Plaintiffs' motion for partial summary judgment is denied. Furthermore, since the Court concludes the FIPA is inapplicable, rescission is unavailable to Plaintiffs as a remedy.

### C.    *Washington Business Opportunity Fraud Act ("BOFA")*

PFI moves for summary judgment dismissal of Plaintiffs' claim under the BOFA.  To date, no Washington appellate court has published an opinion construing the BOFA (RCW 19.100 et seq.), originally enacted in 1981.  The BOFA's legislative declaration states:

> The legislature finds and declares that the widespread and
> unregulated sale of business opportunities has become a
> common area of investment problems and deceptive practices
> in the state of Washington.  As a result, the provisions of

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 14

> this chapter are necessary to counteract the potential
> negative impact of the sale of business opportunities upon
> the economy of the state.

RCW 19.110.010.  Thus, it appears the BOFA is designed to regulate

the sale of business opportunities.  A "business opportunity" means

the "sale or lease of any product, equipment, supply, or service

which is sold or leased to enable the purchaser to start a

business[.]"  RCW 19.110.020(1).  PFI moves for summary judgment

dismissal of Plaintiffs' claim under the BOFA on the basis that PFI

was not the seller of Plaintiffs' distributorships.

"Seller" is not defined in the FIPA, the BOFA, or the Washington

Consumer Protection Act.  Plaintiffs point the Court to related words

defined in the FIPA at RCW 19.100.010:

> (15) "Sale or sell" includes every contract for sale,
> contract to sell, or disposition of a franchise.
> (16) "Offer or offer to sell" includes every attempt or
> offer to dispose of or solicitation of an offer to buy a
> franchise or an interest in a franchise.

Relying on these definitions, Plaintiffs argue PFI should be

considered the seller of the distributorships even though it was not

the actual owner of the rights sold.  In response, PFI points to the

Consignment Agreement and argues the BOFA is inapplicable because PFI

did not sell or lease anything to Plaintiffs.  The Consignment

Agreement clearly provides that "Consigned Products shall be

consigned to consignee ... for sale to and delivery to retail

stores."  Further, PFI notes that the proceeds from the sale of the

distributorships were used to pay bank loans and other debts and the

remainder was returned to Mr. Spangler and Mr. Godwin.  Thus, PFI

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 15

argues it was not the "seller" of the distributorships for purposes of the BOFA.

Plaintiffs also attempt to define PFI as a "seller" by relying on case law from other specialized areas of the law.  First, Plaintiffs point to *Shinn v. Thrust IV, Inc.*, 56 Wash. App. 827, 851, 786 P.2d 285, 299 (Div. 1, 1990), wherein the court noted that under the Washington State Securities Act, a party is a "seller" if his or her acts were a "substantial contributive factor in the sales transaction."  Relying on this definition, Plaintiffs argue PFI was the seller because it was active in every step of the process of selling the distributorships and excluded the prior owners from the sales.  However, the Court determines the statutory definition of seller under the Washington State Securities Act is inapplicable to Plaintiffs' action under the BOFA.  Second, Plaintiffs point to *Carter v. Gugliuzzi, et al.*, 168 Vt. 48, 49, 716 A.2d 17 (1998), where the Vermont Supreme Court found that a real estate broker was a "seller" within the meaning of the Vermont Consumer Fraud Act.  The Court determines this *Vermont* case is inapplicable because Plaintiffs have not shown PFI qualifies as a seller under Washington's Consumer Protection Act.  Third, Plaintiffs point to *Smith v. Dept. of Business Regulation, Div. of Land Sales, Condominiums and Mobile Homes*, 504 So.2d 1285, 1286 (Fla. App. 1 Distr. 1986), a case that was decided under a Florida Statute dealing specifically with vacation and timeshare plans.  The Court is not convinced this case is relevant or analogous to the present case.

The Court concludes Plaintiffs have failed to submit evidence

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 16

creating a material issue of fact with respect their claim under the BOFA. The evidence shows that Mr. Goodwin, the prior owner of Mr. Atchley's distributorship, "owned exclusive rights to sell Pepperidge Farm, Inc. products in the Spokane Valley and Northern Idaho areas for three and a half years" before his route was sold to Mr. Atchley. (Ct. Rec. 143, at ¶ 1). Although Mr. Godwin acknowledges that PFI was significantly involved in the sale of Mr. Godwin's route, his affidavit establishes that he personally made the decision to terminate his Consignment Agreement and sell his route, and that he was the owner of the all of the rights eventually sold to Mr. Atchley. The declaration of Mr. Atchley does not establish any fact to the contrary. Further, Mr. Gilroy's declaration states that he believed he bought his distributorship from Mr. Spangler, not PFI, *see* Gilroy Dep., 52:15-20, and Plaintiffs have not submitted any evidence establishing that Mr. Spangler was not the prior owner of Mr. Gilroy's distributorship. Therefore, with respect to the BOFA, the Court determines PFI was not the seller of Plaintiffs' distributorships. Rather, the evidence submitted establishes only that PFI was acting as an intermediary protecting its interest as a guarantor. Accordingly, PFI's motion for summary judgment dismissal of Plaintiffs' claim under the BOFA is granted.

### D. *Misrepresentation*

To prevail on a claim of negligent misrepresentation under Washington law, Plaintiffs must prove by clear, cogent, and convincing evidence that they justifiably relied on information PFI negligently misrepresented. *Lawyers Title Ins. Corp. v. Baik*, 147

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 17

Wash.2d 536, 545, 55 P.3d 619, 623 (2002).  However, failure to perform promises of future conduct cannot alone establish the requisite negligence for negligent misrepresentation.  *Id.* at 182, 876 P.2d at 448.  "This is because of the absence of any false representation as to a presently existing fact, a prerequisite to a misrepresentation claim."  *Id.*

With respect to their claim for negligent misrepresentation, Plaintiffs allege PFI's agents knowingly or negligently misrepresented their distrbutorships "would be profitable" and they "could expect weekly profit."  Complaint, ¶¶ 3.2, 6.2, 7.11; Aff. John Atchley, Dec. 6, 2004, ¶ 4.  Each Plaintiff alleges "the weekly wholesale volume is nowhere near the amount that PFI led him to believe he could expect."  Complaint, ¶ 4.8.  Plaintiffs also allege PFI "knew the communication regarding the expected weekly profit was false, or [was] negligent in obtaining and communicating the false figures."  *Id.*, ¶ 6.4.  Plaintiffs further allege PFI "knowingly and/or negligently represented that Pepperidge Farm had an unlimited stale policy, and would not charge back for any stale products."  *Id.*, ¶ 6.5.

PFI moves to dismiss Plaintiffs' claim on the basis that all of Plaintiffs' allegations of misrepresentation refer to future conduct and cannot form the basis for a negligent misrepresentation claim.  In their response memorandum, Plaintiffs failed to cite to any specific misrepresentations of existing facts upon which they rely to support their claim for negligent misrepresentation.  However, during oral argument, Plaintiffs argued their affidavits support their

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 18

misrepresentation claim.

Plaintiffs' allegations regarding PFI's representations with respect to the distributorships' expected weekly wholesale volume and PFI's representations that the distrbutorships "would be profitable" and that Plaintiffs "could expect weekly profit," refer to promises of future conduct, which alone cannot establish the requisite negligence for a misrepresentation claim. *Lawyers Title Ins. Corp*, 147 Wash.2d at 545, 55 P.3d at 623. Plaintiffs' allegation that PFI promised it would not charge back for any stale products also refers to a promise of future conduct. However, Plaintiffs' allegation that PFI represented, at the time the Consignment Agreements were signed, that it had an unlimited stale policy does not refer merely to PFI's failure to perform future conduct. Complaint, ¶ 6.5. Rather, this allegation refers to an alleged misrepresentation of an existing fact. Although the Stale Policy was purportedly in effect at the time Mr. Gilroy purchases his distributorship, Mr. Gilroy alleges he was not notified of the policy until seven weeks after purchasing his distributorship. Aff. Gilroy in Support of Renewed Motion for Summary Judgment, ¶ 6 (Ct. Rec. 123). Mr. Gilroy contends that when he purchased his distributorship he was "directed to stock store shelves full of product" and told he "would not be held responsible or accountable for PFI packages that had to be removed when they became stale." *Id.*, ¶ 5. Mr. Gilroy further alleges he would not have purchased the distributorship if he had known about the Stale Policy at the time of his investment. *Id.*, ¶ 7. Mr. Atchley contends that the PFI employees who were responsible for training

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 19

told him to "completely stock [the] shelves and keep them full at all times."  Aff. Atchley in Support of Renewed Motion for Summary Judgment, ¶ 5 (Ct. Rec. 122).  Mr. Atchley asserts that he was told he would "not be held responsible for any product that had to be removed when [it] became stale." *Id.*  Further, Mr. Atchley alleges he did not learn that the Stale Policy was actually enforced until five months after he purchased his distributorship. *Id.*, ¶¶ 6-7.  Moreover, Mr. Atchley alleges he would not have purchased his distributorship if he had known the Stale Policy was actually enforced by PFI. *Id.*, ¶ 8.  The Court determines Plaintiffs' allegations, if proven, are sufficient to establish the requisite negligence for a claim for negligent misrepresentation.  Accordingly, PFI's motion for summary judgment dismissal of Plaintiffs' claim for negligent misrepresentation is denied in part and granted in part.

### E.   *Breach of Contract*

Washington courts follow the objective manifestation theory of contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash.2d 493, 503, 115 P.3d 262, 267 (2005).  Under this approach, the Court attempts to define the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. *Id.*  The Court imputes an intention corresponding to the reasonable meaning of the words used. *Id.*  "Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Id.*  Words are generally given their "ordinary, usual, and popular meaning unless the entirety of the

ORDER RE:  SUMMARY JUDGMENT MOTIONS - 20

agreement clearly demonstrates a contrary intent." *Id.* The Court does "not interpret what was intended to be written but what was written." *Id.*

Here, Plaintiffs' breach of contract claim is based on their claim that the Stale Policy amounts to change in a course of performance. However, the Consignment Agreement does not contain any product return percentages or any obligation on PFI's behalf to provide some type of relief for stale products (i.e. a fixed policy). The Consignment Agreement defines "Stale Products" as "Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time." Thus, interpreting only what is written, PFI's Stale Policy is flexible, exists from time to time, and is subject to change at any time. The Court concludes Plaintiffs cannot base a breach of contract action upon changes to a policy that is, by its own terms, subject to change. Therefore, PFI's motion for summary judgment is granted with respect to Plaintiffs' breach of contract claim.

## IV.   CONCLUSION

PFI's motion for summary judgment dismissal of Plaintiffs' FIPA claim is granted because Plaintiffs have not established they paid a franchise fee. Plaintiffs' claim under the BOFA is dismissed on summary judgment because PFI is not a seller under the BOFA. With respect to Plaintiffs' claim for breach of contract, PFI's motion for summary judgment is granted. With respect to Plaintiffs' claim for negligent misrepresentation, PFI's motion for summary judgment is granted in part and denied in part. Plaintiffs' allegations

ORDER RE:   SUMMARY JUDGMENT MOTIONS - 21

regarding PFI's representations concerning its Stale Policy, if true, are sufficient to establish the requisite negligence for a claim for negligent misrepresentation.   Accordingly,

**IT IS HEREBY ORDERED:**

1.   Defendant's Motion for Summary Judgment Dismissal of Plaintiffs' claims (**Ct. Rec. 133 in CV-04-452-FVS; Ct. Rec. 128 in CV-04-453-FVS**) is **GRANTED IN PART AND DENIED IN PART.**

2.   Plaintiffs' Motion for Summary Judgment **(Ct. Rec. 118 in CV-04-452-FVS; Ct. Rec. 113 in CV-04-453-FVS**) is **DENIED.**

3.   Defendant's Motion to Strike (**Ct. Rec. 146 in 04-452; Ct. Rec. 141 in 04-453**) is **MOOT.**

**IT IS SO ORDERED.**   The District Court Executive is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 20th day of March, 2006.

                    s/ Fred Van Sickle
                    Fred Van Sickle
                United States District Judge

ORDER RE:   SUMMARY JUDGMENT MOTIONS - 22